UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CHRISTOPHER PIANTEDOSI, | ) | |
| Petitioner, | ) | |
| v. | ) | Civil No. 18-12500-LTS |
| COMMONWEALTH OF MASSACHUSETTS, | ) | |
| Respondent. | ) | |

MEMORANDUM AND ORDER ON PETITION
FOR WRIT OF HABEAS CORPUS (DOC. NO. 1)

October 7, 2019

SOROKIN, J.

Christopher Piantedosi, a prisoner at the Old Colony Correctional Center in Bridgewater, Massachusetts, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges limitations the state trial court imposed on the testimony of a defense expert witness. The respondent has opposed the petition. As explained below, Piantedosi's federal claim does not warrant habeas relief.

I.  BACKGROUND

Piantedosi was convicted of first-degree murder on September 23, 2013, following a jury trial in Middlesex County Superior Court. Commonwealth v. Piantedosi, 87 N.E.3d 549 (Mass. 2017); Doc. No. 1 at 1-2.[1] He was sentenced to life in prison. Doc. No. 1 at 1; App. at 8.[2]

---

[1] Citations to documents on the Court's electronic docket reference the assigned docket number and the page number appearing in the ECF header at the top of each page.
[2] The respondent filed a three-volume Appendix ("App.") containing the state-court record as an attachment to its prior motion to dismiss. Doc. Nos. 15-1 (Vol. I, pp.1-697), 15-2 (Vol. II, pp.698-1585), and 15-3 (Vol. III, pp.1586-2535).

The murder victim was Piantedosi's longtime girlfriend, with whom he shared a teenage daughter. Piantedosi, 87 N.E.3d at 550-51. On May 3, 2012, days after his release from a psychiatric hospitalization, Piantedosi visited the victim's home to see their daughter. Id. at 551-52. What began as a verbal argument between Piantedosi and the victim escalated, and ultimately ended with Piantedosi grabbing a butcher knife and chasing the victim from the kitchen to their daughter's bedroom, where he stabbed her to death. Id. at 551. The killing was witnessed by Piantedosi's daughter, as well as one of her friends with whom she had been video chatting on a computer in her room. Id. After his daughter fled and called police from a food delivery person's car, Piantedosi left the house. Id. The next day, Piantedosi drove to a state police barracks in Weston, Massachusetts, parked his car, laid down on the ground in front of his car, and remained there until officers recognized and arrested him. Id.

In his defense at trial, Piantedosi sought to establish that he lacked criminal responsibility for the killing due to involuntary intoxication from newly prescribed antidepressant medications. Id. at 550. Piantedosi presented testimony by his father and a forensic psychiatrist, Dr. Wade C. Meyers, medical records from his past psychiatric treatment and hospitalizations, and a competency evaluation conducted after his arrest. Id. at 552. The Supreme Judicial Court ("SJC") described this portion of the evidence, which is the focus of Piantedosi's federal claim, as follows:

> [Piantedosi]'s father . . . testified to [Piantedosi]'s psychiatric hospitalizations a few days before the May 3, 2012 incident. On April 29, 2012, the father visited [Piantedosi] at the Holy Family Hospital emergency room and observed that he was quiet and nontalkative. According to medical records, [Piantedosi] had been admitted to the hospital for self-inflicted injuries to his arms. He was diagnosed with depression and prescribed Prozac . . . and Trazodone . . . .

2

Upon [Piantedosi]'s discharge on May 2, 2012, his father picked him up from the hospital and drove him to a pharmacy to fill his prescriptions.[3] [Piantedosi] was scheduled to attend an outpatient program beginning on May 3, 2012. He spent the afternoon [of May 2nd] in his room but left to attend classes at a professional school that evening; several of the students in his class noticed that he seemed tired and unwell. The next morning, [Piantedosi] did not come downstairs from his bedroom until approximately 11:30 A.M.; he was pale and dehydrated. [Piantedosi] left the house shortly thereafter, telling his father that he was planning to pick [his daughter] up at school . . . and take her out for ice cream.

Meyers evaluated [Piantedosi] to determine his mental state at the time of the crime. Based on interviews with [Piantedosi], Meyers's review of past psychiatric records, neuropsychological testing, and other information, Meyers concluded that on May 3, 2012, [Piantedosi] did not have the capacity to appreciate the wrongfulness of his conduct and was not able to conform his conduct to the requirements of the law. Meyers opined that [Piantedosi] suffered from involuntary intoxication from the antidepressants Prozac and Trazodone. He explained that possible side effects of those medications included "irritability, rage reactions, hostility, mania, insomnia, racing thoughts, a disinhibition of . . . behavior, impulsivity and trouble concentrating." Meyers opined further that [Piantedosi] suffered from bipolar disorder, and therefore that he was more vulnerable to the toxic effects of Prozac and Trazodone. He noted that Prozac and Trazodone contain warnings to screen for bipolar disorder because "taking those medications has a significant risk of swinging you into a manic episode." He stated that people with bipolar disorder who are treated with antidepressants generally are also treated with mood stabilizers to prevent possible manic episodes.

In rebuttal, the Commonwealth called Dr. Alison Fife, a forensic psychiatrist. Fife also had interviewed [Piantedosi] and reviewed the relevant treatment records and police reports. She disagreed with the conclusion that [Piantedosi] was intoxicated by therapeutic doses of Prozac and Trazodone. She also did not agree with Meyers's diagnosis of bipolar disorder. Fife testified that a mental disease or defect did not "drive" [Piantedosi] to kill the victim. When asked, in her opinion, what did "drive" [Piantedosi] to do so, she responded that feelings of anger, sadness, and rage "drove" [his] behavior.

Piantedosi, 87 N.E.3d at 552-53.

Piantedosi filed a timely appeal. App. at 9. In his brief to the SJC, his counsel raised four issues, including whether precluding the defense expert from testifying about Piantedosi's

---

[3] Footnote 5 to the SJC's decision says, "After [Piantedosi]'s arrest, his father counted the Prozac and Trazodone pills remaining in [Piantedosi]'s prescription bottles. He testified that there was one pill missing from both bottles, which could have indicated that [Piantedosi] had taken his medications as prescribed."

3

statements to him violated the Constitution. App. at 20. In his reply brief, Piantedosi identified three additional issues pursuant to Commonwealth v. Moffett, 418 N.E.2d 585 (Mass. 1981). App. at 133, 137-38.

The SJC affirmed on December 18, 2017. In its decision, the SJC discussed at length and rejected each of the issues raised in Piantedosi's opening brief, and also summarily acknowledged and found "unavailing" the Moffett claims. Piantedosi, 87 N.E.3d at 553-60 & n.11. Piantedosi did not seek certiorari in the United States Supreme Court.

In November 2018, Piantedosi filed a timely federal habeas petition, claiming he was "prevented . . . [from] hav[ing] a complete and full defense" because "[t]he trial court erroneously precluded crucial expert testimony concerning [his] symptoms and past medical history." Doc. No. 1 at 6.[4] Piantedosi's claim has been fully briefed and is ripe for disposition.

## II. LEGAL STANDARDS

State court decisions merit substantial deference. A federal court may not grant a writ of habeas corpus unless it finds the state court's adjudication of the petitioner's claims "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,] or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As the Supreme Court repeatedly has emphasized, this standard is "difficult to meet," and a habeas petitioner carries a heavy burden of proof. Harrington v. Richter, 562 U.S. 86, 102 (2011); accord Cullen v. Pinholster,

---

[4] The petition included several additional claims, which Piantedosi deleted in response to the Court's order finding that, to the extent they presented federal constitutional claims, they had not been exhausted. Doc. Nos. 17, 19, 21.

563 U.S. 170, 181 (2011); see Burt v. Titlow, 571 U.S. 12, 19-20 (2013) (emphasizing the "formidable barrier" faced by a federal habeas petitioner).

If a state court's decision "was reasonable, it cannot be disturbed" on habeas review. Hardy v. Cross, 565 U.S. 65, 72 (2011) (per curiam); see Renico v. Lett, 559 U.S. 766, 779 (2010) (admonishing federal habeas courts not to "second-guess the reasonable decisions of state courts"). A federal court must presume that the state court's factual findings are correct, unless the petitioner has rebutted that presumption with clear and convincing evidence. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340-41 (2003); accord Teti v. Bender, 507 F.3d 50, 57 (1st Cir. 2007); see Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007) (discussing the "separate and exacting standard applicable to review of a state court's factual findings").

A state court ruling is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). The state court is not required to cite, or even have an awareness of, governing Supreme Court precedents, "so long as neither the reasoning nor the result of [its] decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002); cf. Richter, 562 U.S. at 100 (stating "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'" and entitled to deference).

For a habeas petitioner to prevail under this exacting standard, the state court judgment must contradict clearly established holdings of the Supreme Court, not merely law articulated by a lower federal court, and not dicta of any court. Williams, 529 U.S. at 404-05; accord Knowles v. Mirzayance, 556 U.S. 111, 122 (2009); see Marshall v. Rodgers, 569 U.S. 58, 64 (2013)

5

(warning against using circuit precedent to "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] Court has not announced").

A state court decision constitutes an "unreasonable application" of Supreme Court precedent if it identifies the correct governing legal rule, but "unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407-08. When making the "unreasonable application" inquiry, a federal habeas court must determine "whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. An unreasonable application of the correct rule can include the unreasonable extension of that rule to a new context where it should not apply, as well as an unreasonable failure to extend the rule to a new context where it should apply. Id. at 407. It cannot, however, include a decision by a state court not "to apply a specific legal rule that has not been squarely established by [the Supreme Court]." Mirzayance, 556 U.S. at 122. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

A showing of clear error is not sufficient for a habeas petitioner to establish entitlement to relief. Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003); accord McCambridge v. Hall, 303 F.3d 24, 36-37 (1st Cir. 2002) (en banc). Rather, relief is available only where a state court's "determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); accord Brown v. Ruane, 630 F.3d 62, 67 (1st Cir. 2011); see also Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (emphasizing that a habeas court "may not overturn a state court decision . . . simply because the federal court disagrees with [it]"); Richter, 562 U.S. at 103 (requiring a petitioner to "show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond

6

any possibility for fairminded disagreement"). Put another way, relief under § 2254 is warranted only if a petitioner shows that the state court's rejection of his claim was "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible options." Sanna v. Dipaolo, 265 F.3d 1, 13 (1st Cir. 2001) (quotation marks omitted).

Viewed through the lens of these stringent standards, Piantedosi's claim fails.

III. DISCUSSION

Piantedosi challenges the trial judge's "refusal to permit the defense expert [to] testify[] about [Piantedosi]'s statements to him made during [a] forensic exam." Doc. No. 22 at 4; Doc. No. 1 at 6. According to Piantedosi, this ruling "deprived [him] of a meaningful opportunity to present a defense" and violated both state and federal constitutional guarantees to Due Process. Doc. No. 22 at 9. He characterizes the precluded testimony as involving "crucial information at the most crucial stage of his defense," in particular because Piantedosi himself "was the primary historian of his poorly documented symptoms and psychiatric history." Id. He suggests the trial court "mechanistically" applied an evidentiary rule "to defeat the ends of justice," thereby infringing Piantedosi's right to call witnesses and impairing his ability to present "all relevant, material and admissible evidence" in support of his defense. Id. at 10 (citing Chambers v. Mississippi, 410 U.S. 284, 302 (1973)).[5]

---

[5] To the extent Piantedosi's brief hints at other alleged errors by the trial court, e.g., Doc. No. 22 at 13-15 (discussing admission of certain testimony by Piantedosi's daughter and the prosecutor's expert witness, and implying defense counsel was ineffective in failing to call Piantedosi as a witness in response to the limitations placed on his expert's testimony), such errors are beyond the scope of the one properly exhausted claim that is before this Court for resolution on its merits.

7

Under Massachusetts law, "permissible bases of expert opinion testimony . . . include facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion." Piantedosi, 87 N.E.3d at 555 (quotation marks omitted). However, in Massachusetts, "[a]lthough an expert may formulate an opinion based on facts or data not admitted in evidence, but that would be admissible with the proper witness or foundation, <u>the expert may not testify to the substance or contents of that information on direct examination</u>." Id. (quotation marks omitted, emphasis added).[6] This rule is aimed at preventing parties from using expert testimony to circumvent the rule against hearsay. Id. It "leave[s] inquiry regarding the basis of expert testimony to cross-examination," then allows "the proponent of the evidence [to] introduce the details surrounding the source of the expert's opinion" only when "the door is opened by the opposing party." Id.

In analyzing "[t]he judge's decision to require compliance with this rule of evidence" during Piantedosi's trial, the SJC recounted the relevant events as follows:

> In conducting his evaluation of [Piantedosi]'s mental state, Meyers reviewed [Piantedosi]'s mental health records, police reports, and other discovery material; interviewed collateral witnesses; and met with [Piantedosi] on two occasions . . . for a total of about seven and a half hours. On direct examination, defense counsel asked Meyers about certain statements [Piantedosi] had made to him during the course of these interviews. Counsel inquired, "Were you able to learn anything from [Piantedosi] concerning his mental health history . . . that was of significance to you in forming your opinion?"
>
> The prosecutor objected to the question because [Piantedosi]'s statements had not been admitted in evidence. As an offer of proof, defense counsel represented that Meyers would testify to statements made by [Piantedosi] about experiencing manic-like symptoms in the past[,] hyperactivity, increased mood, [and] needing to sleep for a couple of days at a time . . . . Counsel added that he wanted to raise with Meyers "some things about [Piantedosi]'s mental health and employment histories

---

[6] In this respect, Massachusetts evidentiary rules differ from the Federal Rules of Evidence, which would permit experts to include such information in their testimony. See Fed. R. Evid. 703. The SJC has explicitly acknowledged this difference and has intentionally chosen to maintain it. Piantedosi, 87 N.E.3d at 555 & n.7.

8

and . . . the events on May 3."[7] After a lengthy sidebar conference, the judge ruled that the statements made during Meyers's interviews of [Piantedosi] were not admissible on direct examination. During the remainder of his direct testimony, Meyers testified that [Piantedosi] suffered from bipolar disorder. As a basis for this opinion, Meyers stated that he had relied upon [Piantedosi]'s "history from different sources and as well my history from him."

> The thrust of the prosecutor's cross-examination was that [Piantedosi]'s prior treatment records did not support a diagnosis of bipolar disorder. Pursuing this line of inquiry, the prosecutor asked Meyers about records admitted in evidence from the Lahey Clinic and Holy Family Hospital, treatment records from the Cambridge house of correction and Bridgewater State Hospital, and a May 7, 2012, competency evaluation conducted by Dr. Jodie Shapiro. The prosecutor did not challenge Meyer[s]'s reliance on [Piantedosi]'s out-of-court statements as the basis for his expert opinion that [Piantedosi] suffered from bipolar disorder. On redirect examination, defense counsel did not ask Meyers any questions about statements made by [Piantedosi] concerning this subject.

Piantedosi, 87 N.E.3d at 554, 556 (quotation marks and brackets omitted).

The SJC then rejected Piantedosi's claim on its merits, reaffirming its prior decisions explaining the relevant state evidentiary rule and concluding that the trial court had not violated Piantedosi's "constitutional right to present a full defense" by applying that rule to limit Dr. Meyers's testimony regarding the substance of statements Piantedosi made to him. Id. at 556. The SJC reasoned that Piantedosi was able to elicit from Dr. Meyers his diagnosis of bipolar disorder, as well as the fact that the diagnosis came after interviews with Piantedosi and was "based in part upon learning [his] history." Id. The SJC further observed that Piantedosi had not

---

[7] Footnote 6 to the SJC's decision says, "After the conclusion of Meyers's testimony, defense counsel provided the judge with another offer of proof. Counsel represented that Meyers would have testified to the following: (1) [Piantedosi]'s relationship with the victim; (2) the events of May 3, 2013, including 'that morning when he woke up,' 'his plans with [his] daughter and communications with his daughter in the afternoon,' and 'his activities during the afternoon leading up to the time he arrived at [the victim's house],' 'the events between 5:30 P.M. and approximately 6:45 P.M.—that is, in the kitchen and living room area and the event itself'; (3) [Piantedosi]'s employment history, including losing two potential jobs in late April, 2012, after having lost his truck driving position in March, 2012, that caused a significant amount of stress, anxiety, and depression; and (4) [Piantedosi]'s mental health history including instances of manic behavior."

9

been prevented from pursuing an insanity defense, but, rather, had been permitted to offer "testimony from his and the Commonwealth's medical experts, his medical records from four different facilities, and evidence from his competency examination, as well as statements by his father and his classmates as to his appearance and activities . . . after he was released from the hospital." Id. In addition, Dr. Meyers had "provide[d] a detailed description of the events of May 3, 2012," which the SJC recounted in some depth. Id. at 556-57.

The SJC's approval of the manner in which the trial court regulated the scope of Dr. Meyers's testimony in light of the relevant state evidentiary rule was neither contrary to, nor an unreasonable application of, the Due Process Clause or any Supreme Court decision construing it. Although "a state's broad latitude to define rules for the exclusion of evidence and to apply those rules to criminal defendants has constitutional limits," the specific due process right Piantedosi invokes here—the right to present a defense—operates at a high level of "generality," and "the substantial element of judgment required of trial courts in excluding defense evidence" is "entitled to substantial deference" on federal habeas review. Brown, 630 F.2d at 71-73. "With rare exception, a trial court's exclusion of hearsay evidence does not offend the Constitution." Id. at 73. More generally, "the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983). Rather, "to trigger [federal habeas] relief," where a state court has issued a ruling construing or applying a state evidentiary rule such as Massachusetts's limitation on the scope of expert testimony, "the state court's application of state law must be 'so arbitrary or capricious as to constitute an independent due process . . . violation.'" Coningford v. Rhode Island, 640 F.3d 478, 484 (1st Cir. 2011) (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)).

Here, Piantedosi has asserted—but the record does not establish—that the restrictions placed on his expert's testimony meaningfully impaired his ability to pursue a defense, and "so infected [his] trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); see Dowling v. United States, 493 U.S. 342, 352 (1990) (defining "the category of infractions [arising from application of state rules of evidence] that violate fundamental fairness very narrowly"). Piantedosi has cited no clearly established federal law or Supreme Court decision that prohibits—or even addresses directly—a state evidentiary rule limiting testimony about the facts underlying an expert opinion in a manner similar to the Massachusetts rule at issue.[8] "The absence of an on-point pronouncement from the Supreme Court leaves hanging by the slimmest of threads [Piantedosi]'s claim that the state court's [limitation on the defense expert's testimony] can be deemed an unreasonable application of the broader fair-trial principle." Coningford, 640 F.3d at 485.

This Court has reviewed the record of Piantedosi's trial and carefully considered the SJC's disposition of his claim. The record establishes that Piantedosi was able to present considerable evidence supporting his involuntary intoxication/insanity defense, including

---

[8] The Supreme Court decisions Piantedosi does cite are distinguishable legally and factually from this case, are relevant only insofar as they announce general due process principles, and require no particular result here. See Crane v. Kentucky, 476 U.S. 683, 690 (1986) (finding Due Process violation where "competent, reliable evidence bearing on the credibility of a confession," the suppression of which was sought and denied pretrial, was deemed irrelevant and excluded at trial); Chambers, 410 U.S. at 294 (finding that state court's combined application of evidentiary rules against hearsay and against a party impeaching its own witness operated to violate defendant's Due Process where, as a result, the defendant could neither cross-examine crucial witness nor present witnesses to rebut his most damning testimony); Washington v. Texas, 388 U.S. 14, 22 (1967) (finding Sixth Amendment is violated by "arbitrary rules that prevent whole categories of defense witnesses [such as alleged accomplices] from testifying on the basis of a priori categories that presume them unworthy of belief"). The same is true of the decisions Piantedosi cites from Courts of Appeals in other jurisdictions, see Doc. No. 22 at 12-13, which are neither binding on this Court nor reflective of clearly established law against which the SJC's decision may be measured for purposes of § 2254.

establishing on redirect examination certain facts Dr. Meyers had learned from Piantedosi about how he had physically reacted to the newly prescribed antidepressant medications on the day after his release from the hospital (which also was the day of the crime). Piantedosi, 87 N.E.3d at 555 n.8; see also generally App. at 1997-2228 (testimony of Piantedosi's father and Dr. Meyers). "In light of these substantial other opportunities to call the jury's attention to" Piantedosi's psychiatric history and mental state leading up to and during the relevant events, the SJC's endorsement of the trial court's ruling preventing Dr. Meyers from disclosing on direct examination the substance of Piantedosi's statements to him was not "an unreasonable application of clearly established law on the right to present a defense."[9] Brown, 630 F.3d at 74-75; see Coningford, 640 F.3d at 485 ("[W]hether or not an unarguably correct evidentiary ruling, [the challenged ruling] was well within the universe of plausible evidentiary rulings. It was, therefore, not so arbitrary and capricious as to work a denial of the petitioner's constitutionally secured fair-trial right.").[10]

Because Piantedosi has not established an "extreme malfunction" of the justice system, Titlow, 571 U.S. at 20, his claim fails.

---

[9] The Court also notes that, besides assertions Piantedosi makes for the first time in his brief to this Court, nothing in the record suggests he could not have elected to testify in his own defense as to the facts Dr. Meyers was precluded from recounting. Cf. Brown, 630 F.3d at 74 (noting that defendant had "declined to exercise his right to call" another available witness who could have testified to the relevant information without inviting a hearsay objection).

[10] The trial court engaged in lengthy discussion of this evidentiary question with counsel during multiple sidebar conferences and engaged in a thoughtful exploration of the relevant state-court decisions defining the relevant evidentiary rule. App. at 2083-86, 2092-101, 2120-28. This reflects a considered approach to assessing the issue that was neither arbitrary nor capricious.

IV. CONCLUSION

For the foregoing reasons, Piantedosi's habeas petition is DENIED.[11]

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge

---

[11] Because "reasonable jurists" could not "debate whether . . . the petition should have been resolved in a different manner," Slack v. McDaniel, 529 U.S. 473, 484 (2000), no certificate of appealability shall issue. As explained more fully above, Piantedosi cannot demonstrate that the state trial court's application of state evidentiary standards governing expert testimony rose to the level of a federal Due Process violation.